The two that we have this morning, Jones v. Ramaphoe College of New Jersey, I'm sorry, Pi Kappa Alpha International Fraternity, Inc. et al., and it's number 17-3272. Mr. Riggs and Mr. Whalen, whenever you're ready. Good morning, Your Honor. It may please the court. I would like to request three minutes of rebuttal time if I may. That's fine. This court should reverse the order below and dismiss all the constitutional claims against the Ramaphoe defendants for two reasons. First, the individual capacity claims should be dismissed on the basis of qualified immunity. You're going to have to speak up just a tad. Sorry, I apologize. The individual capacity claims should be dismissed on the basis of qualified immunity because it was not clearly established that the alleged misconduct was a violation of a constitutional right as of November 14, 2014. Second, the official capacity claims, the claims against the Ramaphoe College, and the claims against the board should be dismissed on the basis of sovereign immunity pursuant to this circuit's decision, Maliandi. In considering the individual capacity claims, plaintiff's claims stem from the alleged inaction of the fictitiously named security guards in the complaint. It was not clearly established that supervisors and high-level officials at a college could be held liable for subordinate security guards' failure to intervene or prevent access to prohibited or restricted areas at the college under the due process clause. Plaintiff has failed to set forth a case that shows that the alleged misconduct would have been a violation of a constitutional right in accordance with the precedent of this court and the United States Supreme Court. We also have named here in this complaint, Eugene and John Doe's, right? So when it comes to whether qualified immunity applies, don't you need to address that issue as to those who were allegedly manning the gate posts? Judge, today, the John and Jane Doe's that are sued, there aren't any claims, and I'm here to represent the supervisors that have been sued in their capacities, the president, the acting dean, the alcohol abuse coordinator, and the other supervisors that have been sued in their individual capacity. And the claim the plaintiff makes is that these individuals can be liable and that the liability can flow upwards to the supervisors for the alleged inaction of those security guards. So I think Your Honor is accurate in that qualified immunity would have to apply to those security guards as well in order for it to flow upwards to the supervisors. But it needs to be defined with specificity. And just yesterday, the Supreme Court of the United States issued another opinion on qualified immunity and reversed and remanded for the Ninth Circuit for the exact same reasons that we argue in this case, because the Ninth Circuit defined the right at issue too generally. And that's what the district court did in this case. They defined the right at issue as a state-created danger theory constitutional right and just used general state-created danger case law. One way to address that, even in terms of supervisorial liability, is to address whether there is an underlying constitutional violation. And your opening brief seemed to be focused entirely on that issue. That is, whether it fit the definition of state-created danger or there was an absence of affirmative act. Right. Are you now arguing that we should look at this as a matter of whether something is clearly established, which I thought was what you were raising as part of your reply addressing the claim for deliberate indifference? Those aren't the arguments that appear in your opening brief as to state-created danger per se. The qualified immunity analysis, as you know, has two separate prongs and they can be decided either way, whether we decide the clearly established prong or the constitutional violation prong. Your Honor is accurate in stating that the plaintiff hasn't met his burden on the constitutional claim at all here. There is no affirmative action alleged on behalf of anybody at Granville College under this circumstance. And that is the fourth element of a state-created danger claim. Plaintiff's entire claim is premised upon the alleged inactions. The plaintiff was sexually assaulted at a frat house. The perpetrator drove her across campus. And plaintiff alleges that she was driven through security checkpoints. And then that the perpetrator was permitted access to a dormitory that he had no credentials to get access to. But as we know from L.R. and me, you can characterize inaction in some instances as involving action. Don't we take from L.R. that the right question is whether there was a change in the status quo that rendered the victim more vulnerable than he or she would have been otherwise? That's exactly right, Your Honor. And then why haven't they made a valid point here that there was a change in the status quo from the point that the victim and her abuser had been thrown out of the fraternity house, but only because they were allowed into unauthorized areas? And was the abuse allowed to continue without some of the status quo, at least during that interim period, being that she was not then being abused? I would disagree, Your Honor, because the status quo didn't change. It was basically the maintenance of the status quo under these circumstances because there is no affirmative act that created danger on behalf of the Ramapo College defendants that are named in this suit or the fictitiously named security guards. Unlike L.R., where we had an affirmative act of a teacher releasing a kindergarten-aged student out to an individual that wasn't identified and allegedly sexually assaulted the kindergartner, we don't have that here. We don't have any affirmative action on behalf of a Ramapo College defendant. We have passive inaction. There is no allegation that the plaintiff had any communication with any Ramapo personnel under these circumstances. It's merely that the perpetrator was able to drive across the campus and effectuate a second sexual assault in the college dormitory. But there is no allegation that an affirmative action created this danger by the Ramapo College defendants. Ramapo College defendants weren't involved. Similar to the Knight case, where the officer pulls over a drunk driver, takes the husband into custody, leaves the wife, who is clearly intoxicated, to walk home. She ends up with a significant brain injury. You had somebody that changes the environment on behalf of the entity. That's not what we have here. But there were officers, police officers. What about the idea of inaction in this case? And that's exactly what we have here. We have inaction, which isn't an affirmative action in which this court and this circuit has determined does not qualify as a state-created danger because it's a really narrow exception. The plaintiff's claim is that they drove through a security point as they were exiting the school. And there were security officers there who should have seen the condition that she was in and should have taken action. And should have taken action is different than affirmatively taking some action. So, for instance, if the plaintiff would have told one of these security personnel that she's in grave danger and nobody did anything, that would be an affirmative act on behalf of the officer because they now know that there's a danger and the status quo may change. But merely maintenance of the status quo and a vehicle being able to drive through campus is merely passive inaction that this circuit has determined is not actionable under the state-created danger theory. Why shouldn't we think of this as analogous to the security guard unlocking the door and inviting the abuser to take his victim in there? Where in a secluded environment, it would be apparent to anyone, given her state, that the risk of a constitutional violation was very high. Your Honor, I appreciate your concern under that scenario. And if that were the case here and we had an affirmative act of a security guard actually giving access to the dormitory, I think we'd have a closer case of affirmative action creating a danger and changing the status quo. But that is exactly their claim as I understand it. It's that neither the abuser nor the victim had identification to allow them into the dormitory. It was unauthorized access. It's akin to unlocking the door and allowing them into this location where it would be apparent, given her state, that there was an unreasonable risk of a constitutional violation continuing. And I would disagree just because the facts of the case show that the perpetrator gained access to the dormitory by getting a friend's identification card and scanning in and going into the dormitory. There was no security personnel or interaction with security personnel. And as I stated before, if there was some sort of interaction with the security personnel with the plaintiff here, we'd have a closer case. But all we have is allegations that these security officers should have done more. Well, isn't that part of the problem in dealing with this on a motion to dismiss? Because you're saying it's a scanner, not a person. Those are fact questions. You're saying it would be different if they were able to see her state and it was clear what state she was in. But again, those are fact determinations and credibility questions that could be elicited in the course of discovery. I don't believe so, Your Honor, because both qualified immunity and sovereign immunity are immunity from suit. And based upon the facts as alleged, still I go back to the clearly established law. It's not clearly established through specificity that the alleged failures of these security officers could maintain that could be a violation of the substantive due process clause. There's just no law on point that shows that what happened here is a violation of a constitutional right. Well, the only question for us is on the fourth prong, right? Whether there's what happened could be construed as an affirmative act. That's the only question we have as far as a constitutional right violation. But then we go further where the Supreme Court has clearly made clear in Casella and just yesterday in the Esconedo case, you have to define the right with specificity in order to establish the clearly established law prong. And that hasn't been defined. There's no precedent on point here. There's no persuasive authority that states that what plaintiff has alleged is a violation of a constitutional right. So it's not clearly established that there's a constitutional violation under the substantive component of the due process clause. You're talking about supervisorial liability now, not about the underlying liability of the Jane and John Doe's, right? I think I'm talking about both generally as a proposition because it's not clearly established whether there could be a supervisory liability claim here or whether there could be a liability under the state-created danger theory. Relying on generalized state-created danger law is similar to relying on generalized excessive force law, which just yesterday the Supreme Court rejected in Esconedo in saying that you just can't rely on general excessive force law. The facts need to line up. And this court in Sowers just recently in October in 2018 in a high-speed chase did the same in reverse to district court as well because they defined the right too narrowly or too broadly. And the right needs to be defined very narrowly. And in Sowers, the circuit stated that now officers are on notice that this is a constitutional violation, but it wasn't clearly established at the time of the misconduct. And the same goes true here. Well, there was a sexual assault on campus. And then a second sexual assault off campus after she drove through the security position of the college. Isn't that the right to be free from sexual assault? I see that my time has expired. We'll keep going. Had the police, had the officers taken action when she drove through the gate when she got off campus, it might have prevented the occurrence of the second sexual assault. But that's the inaction that doesn't make a state-created danger theory. There was no action. If there was an affirmative action, they would be liable because they had some affirmative act. Here, all we have is passive inaction. And the security guards, there's no allegations that there are any Ramapo officials that had any knowledge of what was happening under these circumstances. And that's what's needed. The state needs to change the status quo. It needs to create an environment where danger occurs. And that is not what happened here. Were there any other prior incidents at this particular fraternity? Not that I'm aware of, Your Honor. If you realize we spent a lot of time on the qualified immunity, on sovereign immunity, Judge McNulty said that, you know, there may be a very good case. Each case has to be considered on its merits, and he just doesn't have enough information here. Your response to that? My response is that this is the same case as Malyandi, and there's no difference. Fraternity College and Montclair State University are governed by the same statutes. They're both, they're the same thing. And so is Rutgers. No, Rutgers is governed by a different statute. And you'll see that in the Kovats case, and that was also discussed in the Malyandi opinion. And the same factors, the Fitchick factors, weigh in favor of finding sovereign immunity for Ramapo College as Montclair State University. The autonomy factor and the status under state law are no different. They're the same exact thing under these circumstances. And where the district court was wrong is where they said they needed more discovery on the funding issue. We didn't argue the funding issue in the lower court, and we're not arguing it now. Do you concede funding? Counsel against you? Yes, we do, Your Honor. Because the way that the Fitchick factors are balanced is you analyze each individually, and then you put them on one side, in favor of immunity or against immunity. And there's two to one here, in favor of immunity. The autonomy factor and the status under state law. There's simply no difference from Ramapo College and Montclair State University. Therefore, Ramapo's entitled to sovereign immunity based upon the status of the law, the relevant statutes, and the public information that's available to this court. You may be right, but there was a very deep record in Malyandi. And McNulty's saying, you know, and I think he's acknowledging, you may be right, but he just didn't have, he said the record is so scant, I don't know what to do here. Your Honor, I would disagree. Malyandi was dismissed on a 12-v-1 motion based upon sovereign immunity and the collateral order doctrine as well. It was a motion to dismiss the same publicly available information that was utilized in that case, could be utilized in this case, to dismiss the constitutional claims against Ramapo, its board, and the official capacity claims on the basis of sovereign immunity. If I could turn back, unless there's more questions on sovereign immunity. On qualified immunity, you've addressed the issues as to state-created danger and your arguments as to the individuals as well as at the access level, as well as supervisory liability on that count. What about count seven? There's another claim for deliberate indifference. It's a freestanding count separate and apart from state-created danger. And the term deliberate indifference doesn't even appear in your opening brief. Have you waived any objection to the district court's sustaining of count seven? No, Your Honor, because the deliberate indifference claim is a substance-to-due process claim to which the Ramapo defendants are entitled to qualified immunity as well. It's the same component as the state-created danger claim. You have the special relationship theory and the deliberate indifference and then also state-created danger. But there can be no special relationship in the high-level education area because the DR case says that there's no special relationship in high school cases with teachers and officials that are sued in those cases. No, special relationship gets us back to state-created danger. I'm asking you about the count that was for deliberate indifference per se. And there, for supervisory liability, in sample, in Barks, we recognized a basis for supervisorial liability where there is a policy in place or the absence of a policy. And it would be apparent to a supervisor that there was an unreasonable risk of constitutional violation. Why haven't they pleaded that here? And why wouldn't that be a clearly established violation? My time has expired. Can I answer your question? You can finish up. Thank you, Your Honor. The Barks in the sample case, the Eighth Amendment cases, in that context, you have a custody issue where you don't have that issue in the college setting. And that was also a basis for the DR case where compulsory attendance didn't necessarily create that relationship where the top management had the control over the lower management who also had then control and custody over the plaintiff. So for those reasons, I think that the cases are different and the deliberate indifference claim fails as a matter of law because there's nothing clearly established in the college setting that a deliberate indifference claim can go forward. Is there something about Barks that you think limits our reasoning to the Eighth Amendment context? I think Barks left open the question and left it for debate as to whether a different constitutional violation is viable. And that is why there is no clearly established law on point that says that a substantive due process violation based upon the alleged misconduct is viable. And for those reasons, I'd ask that you reverse. Thank you very much. Mr. Whalen? Good morning, Your Honors. Thank you. May it please the Court. I would like to start off addressing... You better announce your name just for the heck of it. Oh, yes, Your Honor. Patrick Whalen on behalf of the appellee, Jane Doe, who's anonymous for obvious reasons. Is there any difference, sir, between Ramapo College and Montclair University that would cause us to treat these schools differently? I believe so. I believe that there's substantial differences here and I think... For purposes of immunity. For purposes of immunity, I think what Your Honor said about there being a very deep record in the Montclair State case, we don't have that very deep record here. In fact, the only party that tried to create a record for purposes of evaluating sovereign immunity was the appellee. And we repeat... But what facts would distinguish this case from Montclair's? I think the first facts that would distinguish it would be, well, a couple things. Number one, we cite that they've conceded the funding factor, so the funding factor is done. That was also the same in Montclair State. The second factor of autonomy, we've presented evidence that in their own financial statements... Is that the third factor, autonomy, or the second factor? Autonomy is the third factor. Right. I was just jumping to autonomy because it's clearly... Why don't you deal with the status and then we'll go to the autonomy. Okay. The status factor, I think there's stronger arguments that it is very similar to Montclair and the Montclair statutory analysis. But the statutory analysis, I thought this court concluded in Malianda that it was a very close case, and that that second factor was almost teetering when it was determined to weigh heavily in favor of immunity. Here, other than the defendants, and I think this was rejected by this court in Malianda, this court said at the start of Malianda, we have to be careful to ensure that 11th immunity doesn't extend beyond its reach. And you can't ignore the unique factors or the peculiar circumstances of each university. And what the appellants want to do here is to have this court just say, because the same statutes apply in Montclair... I think they're following you. What are those unique differences? I was just going to say the same thing. Well, I think the statutes are the same. I think the differences are that we've argued in our case that you don't go just based on statutory indicators. The second factor, the second way to look at the second factor of status under state law is to look at the case law. And we've presented case law where the state attorney general has taken the position completely contrary to the position represented to this court in Malianda and that it represents here, that universities and university officials and university administrators are not state actors. That's the position that the state took. And this court said the New Jersey Supreme Court rulings, case law on that second factor would be very important. Here we have their own words. The trustees of both institutions are appointed by the governor of the state of New Jersey. Isn't that a significant factor in terms of sovereign immunity? Yes, and it definitely is analogous to Montclair State. The trustees are involved in the appointment of the president of each institution? Yes, yes, although what we don't know here, based on all the defendants the appellants want to rely on is just citing to the statutory sources themselves. They don't get into the specifics of how Ramapo actually works or how it's actually governed and who has final say. What the statutes say is very significant in our evaluation of whether this is a state institution or not. I agree, and I don't disagree with most of appellants arguments that that second factor, at first blush, weighs in favor of sovereign immunity. But I think it falls out when you dig a little. I think it falls out for two reasons. Let me put the question this way. Are there any significant differences between Ramapo College and Montclair University as determined in the Murley-Annie case that we should focus on? Well, I think unlike Montclair State, there's no deep record here, so it's hard to really make that comparison. Knowing what you know, what are the differences on status and autonomy? I think on autonomy we know from their own financial statements. Back to status. You started to say a couple of things, so what are the differences between this and Mount Leondi in connection with status? With connection to status, I think they're very similar. I don't think on a surface level. We haven't engaged in discovery to dig in to find out how it actually works and how they actually carry out. Do they own land? Have they sued other people? Have they involved themselves independently? We know they have an independent law firm defending them in this case, not the State Attorney General's office. We haven't been able to dig in to a lot of the real specific factors. All we have is the general statutory language that says. . . This court's interpretation of Mount Leondi was it was sort of murky. At the end of the day, most of the factors weighed in favor of Montclair State. Here we don't get to dig any deeper, and what we do know is that simultaneous in 2015 and 2014, right when the events in question happened here, the State Attorney General was telling everybody, in order to gain immunity and not be sued, they were saying administrators and management at the universities and state colleges were not state actors. Precisely the issue they want now this court to say they should get sovereign immunity because they are state actors. Didn't we deal with exactly those issues in Mount Leondi? In footnote 20 of Mount Leondi we identified cases where the state had taken the position that for certain state laws, for example for conflict of interest purposes, that these employees were not state actors. But those are questions of state law. We're looking here in determining federal immunity and how is a position that the state has taken with regard to people being state actors for particular state law purposes, how is that relevant to a determination of, or distinguishes this case from Montclair or is relevant to a question of federal immunity? I think it's relevant based on the fact that this court said in Mount Leondi that after you get past statutory indicators, you want to look at the case law. And yes, in Mount Leondi there were some cases, there were cases on both sides of the fence. Again, sometimes in one state law they said they weren't state actors, including the New Jersey Educational Facilities Authority's case, which is what you're citing, right? Right. So we addressed that in Mount Leondi, right? Yes, yes. But it was more of the rulings by the courts that was being focused on there as precedent. But here it's not the Supreme Court or an appellate division saying that they're not state actors. It's the state attorney generals themselves arguing that employee, that high-level management employees and administrators at state colleges are not state actors. That's almost an admission. That's an inherent inconsistency in their approach. And I think- For very limited purposes of their treatment under state law, which we acknowledged in Mount Leondi and concluded was not sufficient to outweigh the factors, the same statutory factors that seem to apply on all fours here that made the status under state law tilt in favor of immunity. I agree that it was addressed. I agree. It was addressed there. I think it's a little stronger here with this because it's not just a precedent. It's actually their own position. And I think there's an inherent unfairness to be able to argue we're not state actors so that we can be immune from these laws and for these purposes, but we are state actors for purposes of sovereign immunity. The third difference, I think, is the autonomy. In the record, we point to their own financial statements, their own documents that say we operate autonomously from the state. Why do they do that? They tell the public. So in the cases I cite, they tell the courts we're not state actors, and now they tell the public because they want to appear independent from the state, and they argue they're independent. Did Montclair do the same thing? The appellants cite footnote 10 from Mount Leondi. I don't think it's quite as strong as what we cite in the funding records. I think what they did in Mount Leondi, the appellee, or the appellant in that case was actually not the university. They argued, they pointed to statutes, state statutes that said these institutions are supposed to be generally independent and run independent and autonomous. Here, I pointed, the appellee pointed directly to Ramapo College's own financial statements where they're saying we operate autonomously from the state. And I think that's a distinction. I don't think that would. So there's no doubt that Ramapo College received significant funding from the state of New Jersey, is there? I think there is. I think the funding factor they've conceded, but more importantly, when we attached as part of the factual record. What do you mean they conceded? That the funding factor, they have not argued the funding factor. They've conceded the funding factor, and we attached, the appellee made part of the record, their financial statements would show significant decreasing in state aid. The state aid factor is significantly decreasing, and they emphasize that as a point of pride. But I think that favors the idea that they don't satisfy the test here. I think that's what distinguishes this. Didn't we acknowledge in Maliandi as well that the New Jersey legislature has on many occasions declared its intention for state colleges to have institutional autonomy? And we described that and the assertion of that as being, you know, tab-ended for characterizing them as being autonomous for academic purposes, to make them more marketable, for example. Yes. And why, given that and the language of Montclair's financial statements as well, why, again, aren't we on all fours with Maliandi? I think it's stronger when you're talking about a general pronouncement about academic independence, and we all want to know that our colleges, state colleges have academic freedom and are independent. That's a little bit different from the Ramapo College representing itself in its public filings through its audits as operating autonomously from the state. They're themselves saying, we operate autonomously from the state. And they're not limiting it to academic freedom. They're talking in general terms of their financial fiscal operations. And I think that's a distinction. I think it may not be a significant distinction. I think it's enough, though. Given that Maliandi was so close, Cole, I think it's enough to make a difference here. And I also think the lack of a factual record here, a deep factual record, is before the 11th Amendment and sovereign immunity swallows up all agencies, the appellants can't just come in here and say it looks like Montclair State University. There should be some factual digging here so that we can have a more detailed discussion about what the differences are. Let me see if we can just go to the issue that we spent more time on with your colleague on the other side. State-created danger versus deliberate indifference. We'll start with state-created danger. How can there be state-created danger by college officials who didn't know that Ms. Jones was the party? They didn't take any affirmative acts that we know of. State-created danger is a very difficult hill to climb. What makes you think there's state-created danger here? I think that there is. I think we recognize in the case law that the line between action and action is often blurry. The fourth element of state-created danger is present here. It is pled here, and it is not just the security booths. That's not accurate. What was the affirmative act? The affirmative act is the unlocking of the door. It is the sexual assaults. The danger my client faced was over. The rapists. And who unlocked the door? The people who allowed them to come through the security gates when neither one of them were permitted in there. These were employees of the university. They were security, and then the next step is worse. They didn't talk about that at all. It's the resident life people. This isn't a case just about someone sneaking in the back door or getting in the dorm, the freshman dorm. Neither one of these two people were freshmen. There was supposed to be a resident life person there. That's one of the Jane or John Does that's in the caption, and they were supposed to make sure they can't allow anybody access. They allowed them access so that the sexual assaults could continue with a girl who couldn't stand up in the hallways. That should have been obvious to anybody, that you don't allow these people in there where they don't belong. Does the resident life person see what was going on in this case? We plead that they do. We don't know those answers yet because it's premature based on not having complete access to the criminal files and all the discovery that's issued in this case. In other words, it's not just the security checkpoint where they drive across campus through maybe one or two security checkpoints. It's the resident life opening as well, and that's the Affirmative Act. When you say resident life, you're talking about going into the fraternity itself? No, into the freshman dorm after they leave the frat apartment, and he no longer has a place to continue the criminal act, the sexual assault, and he's enabled to do that by the unlocking of the door, by allowing both the victim and the perpetrator where neither one of them belong and should have been allowed in, and that's the Affirmative Act. The distinction from cases like L.R. and Neep, that there was never a moment in this course of conduct when the victim was in fact in a secure environment or ever in the custody of the state, whether a classroom or police taking control of the situation and altering the situation. Throughout this, she's in the custody of the abuser. I agree. She's in the custody of the abuser, and I think that is a distinction. She's not in the per se custody of the state, but I think where the case law permits this to happen, they allowed her to continue the assault, and they increased the risk. And I think the quote I have from this Court's decision in Revis, on page 32 of our brief, it says right there, from Revis v. City of Passaic, this Court's decision, 3rd Circuit, 2004, it was clearly established that the state actors may not abandon a private citizen in a dangerous situation, provided that the state actors are aware of the risk of serious harm, which we plead, which we plead is obvious at the security desk, as security checkpoints. EMT people having control of a situation is very different from the possibility that there might have been a res life person nearby, but you're not quite sure about that. Isn't your stronger claim deliberate indifference? I agree. And they don't even, I think that, yes, my first argument was, they've conceded deliberate indifference on the policy practice level. They don't even address it in their moving papers until the reply. And I think they do that because they know that's clearly established law. This Court has established for decades that acquiescence and custom, with knowledge, with acquiescence will satisfy that constitutional claim with deliberate indifference. Didn't that change with Iqbal? Didn't that change with Iqbal? I mean, mere acquiescence is not sufficient, and our interpretation of that embarks, the same mental state that's required for the underlying tort needs to be present for the supervisor, for there to be supervisorial liability under a theory of deliberate indifference, right? Maybe. I think it's still, that jury, I don't know if that's been clarified, whether or not Iqbal has changed the law on what's presented in Count 7 of our complaint. I think that's still out there. But even if it is, I think the pleadings, and they haven't addressed the pleadings at all, the pleadings are detailed enough that we do allege the level of knowledge and intent above and beyond acquiescence here. Well, clarify for us, what is the nature of your claim under Count 7? Is that, in fact, a deliberate indifference substantive due process claim? Yes, it's under Section 83, policymaker deliberate indifference. What constitutional rights it issue? I believe substantive due process. It's not an equal protection claim? It's not. That's really more addressed in the Title 9 causes of action. Because there are several circuits, including most recently the Fourth Circuit, just a couple of weeks ago, that have held that there is a cause of action for liability of school officials for student-on-student sexual assault. And some of those cases have even held that it's clearly established, although the Fourth Circuit did not. But those were all under equal protection. And am I right in understanding that you did not contest the dismissal of the equal protection claim in the district court? No, we did not. We did not address that. But we do address that same case law, because I think the case law addresses both claims. It addresses equal protection, and it addresses this concept of policymaker deliberate indifference in the face of hostile educational environments at a college setting. But you're doing that in the context of a, as you've now clarified, substantive due process claim in Count 7. And when it comes to expanding deliberate indifference for substantive due process purposes beyond the Eighth Amendment, don't the terms of Barks make clear that that's not clearly established? Because we didn't, we were explicit that we were not deciding whether or under what circumstances it extended beyond the Eighth Amendment. Yes, Your Honor. And I want to backtrack a little bit because, and to be fair to myself, they didn't brief this issue. And so before I can see the equal protection issue, whether or not that was part of the deliberate indifference claim in Count 7, I honestly, it wasn't addressed, it wasn't briefed. I know it was briefed below, but it wasn't briefed up here. So I don't know that. I know that we grappled with and briefed extensively the case law dealing with rapes, peer-on-peer sexual harassment. So if I briefed all those issues, I think those were my claims. But so I, candidly, they didn't oppose this, they didn't brief it in their moving papers, so I didn't really address that aspect of Count 7. Given the terms of Barks and given your answer earlier that, as to whether a claim like this survives Iqbal, if the answer is maybe, isn't that addressing squarely the question of whether it's clearly established or not? Well, I think it's clearly established. I think the issue is a little different. I don't think Iqbal decides whether or not the constitutional right and the deprivation theory exists. I think Iqbal establishes the level of pleading, what the elements need to require for purposes of pleading, and I don't think it's the same exact thing. But as we interpreted that in Sample and Barks, it goes to the mental state that's required. Which, again, I think we pled in the alternative. We pled the knowledge, intent, and we pled deliberate indifference. So I think that's why, again, they don't really address the detailed pleadings we presented in our complaint. You have other claims, don't you, Mr. Whalen, in this case? That is, direct claims against the abusers and, if I'm not mistaken, the fraternity itself, local and national? Yes, many, many. And there are claims against Ramapo College. Any claims or many defendants? There are several groups of defendants and there are numerous claims. Some are against Ramapo College that have not been addressed, that will remain. So this appeal concerns solely the status of Ramapo College and its employees? Yes. Okay. And that's solely on the constitutional claims, right? And we'll ask your adversary as well, but there's no dispute that the Title IX damages claims are preceding the district court, right? They are, and discovery has commenced. Okay, and what is your position as to the state law claims, the civil rights claim, the law against discrimination, and the common law claims in the New Jersey Court Claims Act? They are proceeding as well. They didn't appeal those aspects of the court's ruling. Most of those claims remain. Do you agree that the Civil Rights Act tracks whatever we do in terms of qualified immunity in 1983? The laws, yes. The briefs from the appellants establish, yes, the law establishes that. The New Jersey Civil Rights Act claims now follow the sovereign immunity analysis. Your adversary has asserted that that is true as well of the law against discrimination and the tort claims, the common law tort claims. Do you agree with that? No. That it follows federal qualified immunity? We don't agree with that, and I don't think they appealed that aspect of the rulings with regard to the LAD or the Tort Claims Act, and, in fact, I think there's a number of cases, and they may be cited in Malienda, that say the LAD claims can persist and can survive, and even the federal courts can continue to maintain federal jurisdiction over those claims, even if the constitutional claims were to be knocked out. Thank you very much. Thank you. Thank you. If I may, and I'll be very brief, Your Honors, and may it please the Court. Maricopa College and Montclair are one of the same, and sovereign immunity should apply here. They're governed by the same statutes and the Malienda case controls, and I really want to focus the attention on the clearly established prong for the constitutional violations in Counts 7 and 8. Now, in addressing Judge Cross's concern as to the tort claims and the LAD claims, they're not on appeal. We're appealing the constitutional claims that are brought under 1983 and the New Jersey Civil Rights Act that parallels the 1983 claims. And the Title IX Damages Claim, you agree that that is also ongoing in the district court? That's accurate, Your Honor. We're appealing the constitutional claims and rather post-status as a state entity entitled to sovereign immunity and the qualified immunity aspect of the constitutional claims only. Clearly, through this debate, we've determined that it isn't clearly established that the alleged misconduct here is a violation of the Substantive 2 Process right. There's no case on point that says that this alleged misconduct violates a constitutional right. So Plankett hasn't met his burden in getting over the hurdle of the qualified immunity analysis, and the individual defendants are entitled to qualified immunity in this case. What if we wanted to look at the question of the underlying merits there? Do you concede that they have, with what they've pleaded about the failure of the college to maintain or enforce policies as to alcohol abuse and the conduct of fraternities and the investigation and reporting of sexual assaults, et cetera, that what they've pleaded would state a claim for deliberate indifference at the level of a policy by the university? I would not agree. I don't think they stated a deliberate indifference claim as a matter of law because there is no violation of the Substantive 2 Process right under a special relationship theory is where that deliberate indifference language comes from as far as a 14th Amendment claim. You have the special relationship, which we didn't recognize in this circuit in DR with high school students, and then you also have the state-created danger aspect. I don't think that the plaintiff has met the affirmative action element in this case. You're reverting to a discussion of state-created danger. I'm asking you about deliberate indifference in the nature of a sample of barks. And there the only question is, was there a policy that either by its terms created or its lack of enforcement created an unreasonable risk of a constitutional violation? Separate and apart from the issue of access along the way for this particular activity, they've pleaded a deliberate indifference claim that seems to go, as they list the itemized failures, to the existence of an overarching culture, policies or the absence of policies as to alcohol abuse, etc. Why isn't that enough on the merits to state a claim for deliberate indifference as to a supervisory liability on a policy? It's a different question whether that's clearly established, right? May I answer the question? Yes. I don't think that there's any case on point that under the 14th Amendment, you can state a deliberate indifference claim based upon policy practice and supervisory liability, and that's because Iqbal has created this world where we don't really have a clearly established law that says that there's a 14th Amendment violation under these circumstances. So I don't think that they've pled a violation because I'm not aware of any case that says there actually is a violation under a similar set of circumstances, which also goes back to why it's not clearly established under these circumstances and why that problem fails. Isn't that Barks with a policy as to, or the lack of policy to address the risk of suicide? I would say the distinguishing factor in Barks is the fact that you have the custody levels. You have supervisors who control the guards, the prison guards. Prison guards are controlling the custody of the inmates. We don't have that control factor by the state under the circumstances on a college campus setting for the policies that are in place. And there's a deliberate indifference in that circumstance because the individual is in the custody of the state, and it can't fend for themselves. So for those reasons, that's why the deliberate indifference policy claim stands under the 14th Amendment, or I'm sorry, the 8th Amendment, but it doesn't stand under the 14th Amendment under these circumstances. So for those reasons, I'd ask that you reverse the decision over to the court. Thank you very much. Thank you to both counsel for very well-presented arguments. I'm going to take the matter under advisement.